LEWIS AND ROCA LLP
LAWYERS

40 North Central Avenue
Phoenix, Arizona 85004-4429

Stephen M. Bressler, State Bar No. 09032
Direct Dial: (602) 262-5376
Direct Fax: (602) 734-3742
E Mail: SBressler@LRLaw.com
Stefan M. Palys, State Bar No. 024752
Direct Dial: (602) 262-5352
Direct Fax: (602) 734-3796
E Mail: SPalys@lrlaw.com

Attorneys for Plaintiff The Paul Revere Life Insurance Co.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

The Paul Revere Life Insurance Company,
Plaintiff,

vs.

Michael K. Kelly,
Defendant.

No.CV07-02629-PHX-HRH

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56[1], plaintiff The Paul Revere Life Insurance Company moves for partial summary judgment that the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1001 *et. seq.,* governs this case. The defendant's law firm established and maintained a program of medical, surgical or hospital care benefits through the purchase of insurance. This program constituted an employee welfare benefit plan within the meaning of ERISA. One of the plan benefits was the defendant's individual disability insurance policy with Paul Revere, which underlies this case. Plaintiff seeks a ruling that ERISA governs this policy.

Pursuant to the Court's Preliminary Scheduling And Planning Order (dkt 14), Paul Revere also submits this memorandum on the proper scope of review under ERISA. As explained below, in an ERISA action such as this, the Court's review is limited to the administrative record.

[1] This motion is also made at the request of the Court in its Preliminary Scheduling And Planning Order (dkt 14).



**MEMORANDUM OF POINTS AND AUTHORITIES**

**1. The Paul Revere IDI Policy Was Part of the Snell & Wilmer's Employee Welfare Benefit Plan.**

Snell & Wilmer is a southwestern law firm based in Phoenix, Arizona. It provided its partners, associates, and employees health insurance, dental insurance, vision insurance, life insurance, supplemental accidental death and dismemberment insurance, death benefits, short term disability insurance, and long term disability insurance. (SOF ¶ 1.) This met ERISA's definition of an employee benefit plan. Snell established and maintained this plan (or program) for the purpose of providing for the partners, associates and employees (participants) and their families (beneficiaries) medical, surgical or hospital care benefits through the purchase of insurance. Accordingly, it is governed by ERISA. 28 U.S.C. §§ 1002(1), 1003.

Since 1981, Snell has funded the plan's disability benefit by purchasing a group long term disability (LTD) policy from Unum Life Insurance Co. of America. (SOF ¶ 2.) The group LTD policy covers three classes: Class 1 includes all partners and executive directors, Class 2 includes all associates, and Class 3 includes all other employees. (SOF ¶ 3.) The LTD policy pays a monthly benefit to the participant or beneficiary if they meet the policy's definition of disability. (SOF ¶ 4.) The monthly benefit for the partners in class 1 was 60% of their income up to $35,000. (SOF ¶ 5.)

The LTD policy is renewed annually and the renewal premium is based, in large part, upon the group's loss experience. (SOF ¶ 6.) Over the years, Snell had a poor loss experience. From 1981 to 1999, Unum paid out $11,595,178 in claims while collecting only $4,453,499 in premiums. (SOF ¶ 7.) This did not include Unum's costs in administering those claims. Consequently, Unum was annually forced to raise its premiums. Even with the premium increases, this did not cover the cost of the Snell claims. (SOF ¶ 8.) Unum continued to lose money on the Snell account.

Every year, Snell looked for ways to reduce its premium increases. This included changing features in the LTD policy such as extending the elimination period for certain

classes from 90 days to 180 days (SOF ¶ 9a), removing benefit features from the policy[2] (SOF ¶ 9b), changing the cost of living adjustment (SOF ¶ 9c), reducing the monthly benefit (SOF ¶ 9d), changing the definition of total disability for certain classes (SOF ¶ 9e), and limiting the benefit period to two years for mental or nervous claims (SOF ¶ 9f).

In 1998, Snell had a 40% increase in its premium for the LTD policy. (SOF ¶ 10.) It began to look for additional ways to "reduce the benefits to help offset the extent of the increase in rates and decrease Unum's 'exposure'." (SOF ¶ 13.) Snell wanted to "[s]tabilize [the] cost of [the] benefit plan." (SOF ¶ 14.) Snell instructed its insurance broker to negotiate with Unum and find ways to contain Snell's premiums. (SOF ¶ 12.) After considering various alternatives (SOF ¶ 9) and in the face of another 15% increase in premiums in 1999 (SOF ¶ 11), Snell decided to contain its LTD premiums by transferring "a large portion of the risk on [the] plan covering the Class I group (Partners) . . . to individual policies." (SOF ¶ 15.)

Snell and its broker negotiated with Unum and The Paul Revere Life Insurance Co. to develop what is called a "reverse combo" plan. (SOF ¶ 16). Snell considered the IDI and LTD coverages under the "reverse combo" plan as "integrated." (SOF ¶ 17) Under the "reverse combo" plan, the first $7,500 of monthly benefit for the partners in class 1 was transferred from the group LTD policy to individual disability income (IDI) insurance policies with Unum's sister company, The Paul Revere Life Insurance Co. (SOF ¶ 18.) The IDI policies provided a monthly benefit of up to $7,500. (SOF ¶ 14.) The $7,500 IDI benefit was paid first – and was a dollar for dollar offset against the LTD benefit (which paid up to $35,000 depending on the income of the partner). (SOF ¶ 17.)

Snell negotiated a 35% discount off the IDI premium that would otherwise be available in the open market[3]. (SOF ¶ 19.) This saved both Snell and the class 1 partners

---

[2] *E.g.,* the extended care benefit and the recovery income protection benefit. (SOF ¶ #10b)

[3] Paul Revere offered the class 1 partners Guaranteed Standard Issue regardless of their health. The company further offered sex distinct rates (which were advantageous to female partners) and a multi-life discount (meaning that they were getting a less costly group rate).

LEWIS AND ROCA LLP LAWYERS

premium dollars and over time, these savings were expected to grow.[4]

The IDI coverage was not voluntary; it was mandatory. As a condition of purchase from Paul Revere, Snell guaranteed that 100% of its class 1 partners would participate. (SOF ¶ 20.) The class 1 partners did not have any choice in the insurance company or the details of the insurance policy. "If the required participation [was] not achieved, the [Paul Revere] offer [became] void after the initial enrollment." (SOF ¶ 20.)

Snell purchased these policies on behalf of the class 1 partners. The class 1 partners were not involved. (SOF ¶ 21.) Snell handled the enrollment and the payment. (SOF ¶ 21.) It debited the class 1 partners for the premium payment. (SOF ¶ 22.) To the Snell class 1 partner, this was a deduction for disability insurance just like before.[5]

While Snell did not pay the premiums for the class 1 partners, it did pay the premium for the firm's executive director, who was also a class 1 participant. (SOF ¶ 23.)

Snell's executive director announced the change in an April 2, 1999 memorandum to the Snell class 1 partners:

> We have experienced significant increases in the rates for the group LTD coverage with UNUM Life Insurance Company (UNUM) over the past four years. All indications are these increasing costs will continue into the future. We have completed an extensive review of alternative plans and the UNUM policy is superior in benefits to any other available in the market. Effective April 1, 1999, the LTD coverage will be a combination of an individual policy through Paul Revere Life Insurance Company (Paul Revere) and the group coverage through UNUM. The individual coverage is being purchased to assist in stabilizing the costs relating to this benefit.

(SOF ¶ 24.)

[4] Under the group LTD policy, each class 1 partner paid a premium based upon the entire group's experience. However under with the IDI policies, each class 1 partner had a guaranteed level premium. This meant that it could never go up, regardless of the group's experience or the class 1 partner's experience. This was particularly advantageous for Snell's younger partners.

[5] Snell paid the premiums for the class 2 and 3 participants. (SOF #)

In a later memorandum, a Snell partner described the reverse combo plan as splitting the LTD Plan into two pieces:

> As you will recall, in 1999 we split our LTD Plan into two pieces. We have an individual policy for each partner (excluding a few partners with insurability problems) that provides a base level of benefits of $7,500 per month. We also have the group policy.

(SOF ¶ 25.)

Snell's strategy was sound. By January 2002, Snell's broker advised that this change led to improved claims experience. The broker planned to use the improved loss experience to negotiate a lower premium with Unum:

> The plan design modifications in prior years and transferring part of the liability under this contract to individual policies for the Partners in 1999 have contributed to the improved claims experience. Consequently the premium amounts established based on prior year's claim experience are in need of adjustment.

(SOF ¶ 26.)

Michael Kelly was a partner at Snell and a participant in its employee benefit plan. (SOF ¶ 28.) He first enrolled in the group LTD coverage in April, 1994 (SOF ¶ 29) and he enrolled in the IDI coverage in 1999. (SOF ¶ 30.) As a partner, he was a class 1 participant.

On August 3, 2004, Kelly submitted a disability claim based upon chemical dependence (cocaine) and he later also claimed to be disabled because of depression. (SOF ¶ 31.) Both Unum and Paul Revere dutifully paid him benefits. Unum paid $865,200 in benefits[6] while Paul Revere has paid $362,670 in benefits to date. (SOF ¶ 32.) Paul Revere continues to pay $7,500 monthly. (SOF ¶ 33.)

The problem is that Kelly is not using the money to get himself better. To be eligible for disability benefits, the IDI policy requires Kelly to be under "the regular and personal care of a [p]hysician which, under prevailing medical standards, is appropriate

---

[6] Under the LTD policy, benefits for disability due to mental illness do not exceed 24 months of monthly benefit payments. The plaintiff filed a separate lawsuit contending that his sickness is not a mental illness and therefore the limitation does not apply. *Kelly v. Unum Life Ins. Co. of Am. & the Welfare Benefit Plan Admin. Committee of Snell & Wilmer, L.L.P.*, No. CV07-02512 -PHX-JAT. The parties have not yet discussed whether the cases should be consolidated.



for the condition causing the disability." (SOF ¶ 34.) The plaintiff rarely sees his addictionologist, Dr. Michael Sucher. In 2007 he only saw Dr. Sucher once in February, once in May, once in September, once in November, and once in December. (SOF ¶ 35.) Dr. Sucher would like to see Mr. Kelly receive inpatient or residential chemical dependency treatment. (SOF ¶ 36.) Yet Kelly refuses. (SOF ¶ 37.) If Kelly complied with Dr. Sucher's treatment recommendation, Dr. Sucher predicts Kelly would have at least an 80% likelihood of fully recovering and returning to work. (SOF ¶ 38.)

Kelly also has seen a psychiatrist, Dr. Laura Harrington (SOF ¶ 39), but his visits to her are similarly infrequent and sporadic. In 2007, he saw Dr. Harrington in March, April, twice in May, and then not for the rest of the year. (SOF ¶ 40.) He often showed up late or canceled visits. (SOF ¶ 41.)

Because he was not complying with the policy's appropriate care requirement, Paul Revere brought this declaratory judgment action. (SOF ¶ 42.) Before resolving the underlying issue of whether Kelly is complying with policy's requirements, the Court and the parties will need to know the applicable law. Specifically, whether ERISA governs the policy. Paul Revere has brought this motion seeking a ruling that ERISA applies before the parties bring the substantive declaratory issue before the Court.

**2. ERISA Governs Kelly's IDI Policy. The Department of Labor's Safe Harbor Exemption Does Not Apply.**

ERISA comprehensively regulates employee welfare benefit plans. 29 U.S.C. §1003. It applies to any "plan, fund or program" established or maintained to provide its participants (partners, associates and employees) or their beneficiaries (family members) benefits in the event of sickness, accident, disability, death or unemployment through the purchase of insurance or otherwise:

> [A]ny plan, fund, or program which . . . is . . . established or maintained by and employer or . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . .

29 U.S.C. § 1002(1). That is exactly what Snell did here. Snell established and maintained this plan (or program) for the purpose of providing for the partners, associates and employees (participants) and their families (beneficiaries) medical, surgical or hospital care benefits through the purchase of insurance.

Kelly does not dispute that the LTD group policy is governed by ERISA. Instead, he argues the IDI policy is separate and not governed by ERISA. He claims that the Paul Revere policy was an individual policy purchased and paid for by him. This is incorrect. They were "integrated." Snell, not Kelly, studied the market, reviewed the potential carriers, selected the policy features, negotiated with Paul Revere, and purchased the policies. It required its class 1 partners to participate in the IDI coverage if they wanted the disability benefit under the plan.

Snell paid one lump sum premium to Paul Revere. The IDI policies provided the first $7500 of monthly benefit. The group LTD policy then provided the remainder of the monthly benefit up to $35,000 per month.

While Snell debited the class 1 partners' accounts for the premium cost, it paid the premium for at least one class participant who was not a lawyer, partner or owner of the firm – the executive director. (SOF ¶¶ 21 & 22) ERISA applies on this basis alone, because the inclusion of even one non-partner employee is sufficient to bring a policy within ERISA's scope. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 264 (9th Cir. 1991); *Peterson v. American Health & Life Ins. Co.*, 48 F.3d 404, 407-08 (9th Cir. 1995); 29 C.F.R. § 2510.3-3(b).

Kelly may argue this case falls within the Department of Labor's "Safe Harbor" exemption. It does not.

The Department of Labor promulgated a very limited "Safe Harbor" regulation, which is found at 29 C.F.R. §2510.3-1(j). The DOL recognized there were situations where the involvement of the employer in the operations of the program was so minimal that the involvement would not constitute establishment or maintenance of a program for purposes of ERISA. Thus, the DOL enacted the following regulation and required that



all four prongs must be met for the exemption to apply[7]:

> (j) **Certain group or group-type insurance programs.**
> For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which
>
> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation in the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

Here, Snell's involvement was hardly minimal. None of the four prongs are met.

**1. Snell Contributed To The IDI Policy.**

The first prong is not met if the employer makes contributions to the plan. Snell made a direct contribution to the plan by paying the premium of the executive director. And it made indirect contributions by securing significant discounts for the class 1 partners.

An employer can pay premiums indirectly by securing benefits for participants and beneficiaries that they could not otherwise receive. "Where an employer provides its employees benefits they cannot receive as individuals, it has contributed to an ERISA plan." *Brown v. the Paul Revere Life Ins. Co.*, 2002 U.S. Dist. LEXIS 8994, * 21 (E.D. Pa. 2002) (15% discount on insurance premium was contribution where only available because plaintiff purchased insurance with other employees); *Stone v. Disability Mgmt.*

---

[7] *See Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904 (9th Cir. 1997), *citing Kanne v. Conn. Gen. Life Ins. Co.*, 867 F.2d 489, 492-93 (9th Cir. 1998) (if just one criteria is missing, the program is not exempted from ERISA).



*Servs.*, 288 F. Supp. 2d 684, 692 (M.D. Pa. 2003) (10% premium discount available because employees grouped on one bill was contribution); *accord Halprin v. Equitable Life Assur. Soc'y of the United* States, 267 F.Supp.2d 1030, 1037 (D. Colo. 2003) (Safe Harbor inapplicable where employer negotiated term and contributed in the form of 10-20% for employees); *Kuehl v. Provident Life & Accident Ins. Co.*, 2000 U.S. Dist. LEXIS 21625 (E.D. Wis. April 20, 2000) (10% premium discount available only to employees was contribution).

Here, Snell (through its insurance broker) negotiated with Paul Revere and achieved a 35% discount on the IDI premiums. This was no different than if Snell had paid 35% of the premium. And Snell then paid the premium to Paul Revere and debited the partners' account at the firm.

**2. Participation Was Not Voluntary.**

The second prong is met only if the participation is completely voluntary. Here it was not. The "reverse combo" plan tied the LTD and IDI policies together. For Snell to transfer the first $7500 benefit from the LTD policy and place it in the IDI policies (and obtain a 35% discount) Snell had to guarantee 100% participation by the class 1 partners. *The Meadows v. Employers Health Ins.*, 826 F. Supp. 1225, 1229 (D. Ariz. 1993) (plan not completely voluntary where employer guaranteed 100% participation); *Chamblin v. Reliance Std. Life Ins. Co.*, 168 F. Supp. 2d 1168, 1172 (N.D. Cal. 2001) (not completely voluntary where employer guaranteed insurer that a specific percentage of employees would participate).

**3. Snell Endorsed The IDI Policy.**

The third prong is not met if the employer endorses the plan. An employer endorses a policy when it does more than act as a "mere advertiser who makes no contributions on behalf of its employees." *Credit Mgrs. Ass'n v. Kennesaw Life & Accident Ins. Co.*, 809 F.2d 617, 625 (9th Cir. 1987); *Ivanciw v. UNUM Life Ins. Co. of Am.*, 1996 U.S. App. LEXIS 17671 (9th Cir. July 11, 1996) (employer not "mere advertiser" where it required participation in its plan and served administrative functions



in implementing plan) (unpublished decision); *see also Cockey v. Life Ins. Co.,* 804 F. Supp. 1571, 1575 (S.D. Ga. 1992) (employer endorsed plan even where employees paid premiums because employer presented plan as part of its benefits package, rather than allowing insurer to promote plan itself).

As Snell did here, where an employer selects the insurer, negotiates the coverage for the employees, and selects which employees would be eligible, it has endorsed the plan, even though after that the employer does no more than act as a pass-through for the insurer. *See, e.g., Brunage-Peterson v. Compare Health Servs. Ins. Corp*., 877 F.2d 509, 510-11 (7th Cir. 1989) (employer endorsed a plan where it selected the health insurer, negotiated the coverage employees could choose, and selected which employees would be eligible, even though after that the employer did little other than act as a pass-through for the insurer); *Chamblin*, 168 F. Supp. 2d at 1171-72 (Employer endorsed a plan where it guaranteed the insurer that a specific percentage of employees would participate, encouraged its managers to purchase coverage, and negotiated the policy terms); *Hrabe v. Paul Revere Life Ins. Co.*, 951 F. Supp. 997, 1003 (M.D. Ala. 1996) (Court found endorsement where an employer did no more than select one plan that employees could choose to participate in. The court explained that selecting and listing that policy in the company's insurance materials "is a direct endorsement" because the employer is telling its employees the plan is the only one they may choose.).

Snell endorsed the Paul Revere IDI policy. Indeed, in a memo to its partners, Snell's executive director advised that the firm had "completed an extensive review of alternative plans and the Unum policy [was] superior in benefits to any other available in the market." (SOF ¶ 23.) Accordingly, Snell moved to a "reverse combo plan" with Unum and its sister company Paul Revere.

Snell selected Paul Revere to the exclusion of the multitude of other disability carriers in the market place, it negotiated the details of the coverage to be offered to the class 1 partners; it negotiated the price; it negotiated which plan participants would be eligible for the policies and secured a 35% premium discount; it guaranteed that all class



partners would participate; it paid for the premium of at least one class member (the executive director) and it paid all premiums to Paul Revere and debited those premiums to the class 1 partners.

**4. Snell Received Consideration In Connection With The Program.**

The fourth prong is not met if "[t]he employer . . . receives . . . consideration in the form of cash *or otherwise* in connection with the program." 29 C.F.R. §2510.3-1(j)(4) (emphasis added). We were unable to find any cases analyzing the meaning of "consideration" as used in the regulation. This Court can find, however, that Snell received consideration for its IDI policy because it achieved savings in its welfare benefit program. (SOF ¶ 27.)

**3. If This Lawsuit Is Governed By ERISA, Then The Court's Scope Of Review Is Limited To The Administrative Record. There Will Be No Discovery.**

In ERISA cases, the Court decides the merits based upon a "paper trial" – that is, a bench trial based only upon the administrative record. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090-91 (9th Cir. 1999). "[A] district court should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the plan administrator." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1995). Instead, a district court should admit extrinsic evidence "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Id.* (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc)).

The rule from *Monguelzo* is a restrictive one. *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007). Additional evidence should not be considered absent exceptional circumstances because the question is still whether the *administrator* made a correct decision. *Opeta*, 484 F.3d at 1217. In *Opeta*, the Ninth Circuit held that the district court erred by admitting additional evidence where it reviewed *de novo* a plan's decision that a participant was not totally and permanently disabled. *Id.* The



question in *Opeta* was whether the administrator erred in deciding the participant was not totally and permanently disabled. *Id*. at 1219. The district court had accepted a surveillance tape from Northwestern that was not part of the administrative record, which showed the participant doing "light yard work." *Id*. at 1219. The Ninth Circuit held the district court abused its discretion because the tape was not in the record, and other materials that were in the record described the tape, making the tape unnecessary for the district's court's review. *Id*.

Here, the administrative record contains medical records and statements from the defendant's treating physicians. Paul Revere is not aware of anything further that the defendant would want the Court to consider. He did not detail this in the Joint Report that the parties submitted to the Court.

**4. Conclusion.**

Snell provided its partners and employees with an employee welfare benefit plan. The plan included disability coverage. The disability coverage was provided to three classes of participants: partners, associates, and employees. The class 1 disability coverage was provided through two insurance policies: a Unum group LTD policy and Paul Revere IDI policies. The DOL Safe Harbor regulation does not apply. The Court should declare that the IDI policy is subject to ERISA. And the scope of the Court's review should be limited to the administrative record.

RESPECTFULLY SUBMITTED this 19th day of May, 2008.

LEWIS AND ROCA LLP

By s/Stefan M. Palys
Stephen M. Bressler
Stefan M. Palys
Attorneys for Plaintiff The Paul Revere Insurance Company

**CERTIFICATE OF SERVICE**

I certify that on May 19, 2008, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Daniel P. Beeks
Mohr, Hackett, Pederson, Blakley & Randolph, P.C.
2800 N. Central Avenue, Suite 1100
Phoenix, AZ 85004-1043
*Attorneys for Defendant*

Michelle Gallegos